UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ARTHREX, INC.,

        Plaintiff,

v.                                        Case No:  2:21-cv-850-JLB-NPM

JEREMY CHARLES HILTON, an
individual, and PARAGON 28, INC., a
Delaware corporation,

        Defendants.

_____

## **ORDER**

       This matter comes before the Court on a Motion for Preliminary Injunction

filed by Plaintiff Arthrex, Inc. ("Arthrex") as well as two Motions to Dismiss filed by

Defendants Jeremy Charles Hilton ("Mr. Hilton") and Paragon 28, Inc. ("Paragon"),

asserting that this Court does not have personal jurisdiction over them.  Paragon

has filed a response in opposition to Arthrex's Motion for Preliminary Injunction.

Arthrex has filed Responses in opposition to Hilton's and Paragon's motions, and

Paragon has filed a Reply.  The Court has also conducted an evidentiary hearing

and carefully reviewed the entire record, including the myriad exhibits submitted

by all parties.  (Doc. 35; Doc. 37.)

       After considering all of the relevant materials, the Court finds, for the

reasons outlined below, that it has personal jurisdiction over Mr. Hilton, but it does

not have personal jurisdiction over Paragon.  As such, Mr. Hilton's Motion to

Dismiss (Doc. 30) is **DENIED**, and Paragon's Motion to Dismiss (Doc. 31) is

**GRANTED**.  The Court also finds that Arthrex has failed to sufficiently establish

justification for the entry of a preliminary injunction at this time.  Accordingly,

Arthrex's Request for Preliminary Injunction (Doc. 2) is **DENIED**.

## BACKGROUND

Arthrex is a "leading designer and manufacturer of orthopedic surgical

products and related medical training," which has its principal place of business in

Naples, Florida.  (Doc. 1 at ¶¶ 1, 8.)  One of Arthrex's many lines of business is the

design and development of products related to the foot and ankle.  (Id. at ¶¶ 22–23.)

Arthrex sells these products nationwide and internationally via a network of

customer contacts as well as proprietary sales strategies, training methods, pricing

procedures, and marketing materials.  (Id. at ¶¶ 24, 27.)

Paragon is a medical device company focused exclusively on creating

orthopedic surgical products for the foot and ankle.  (Id. at ¶¶ 29–31.)  Paragon's

principal place of business is in Englewood, Colorado.  (Id. at ¶ 10; Doc. 37 at 54.)

There are similarities between Paragon's products and Arthrex's products, and the

two companies compete directly for the same clients and entities in the same

geographical regions.  (Doc. 1 at ¶¶ 31, 33.)  Arthrex and Paragon "often submit bids

and respond to requests for proposals from the same potential clients/accounts."

(Id. at ¶ 33.)

In addition to their overlapping businesses, Arthrex and Paragon are linked

by Mr. Hilton.  Mr. Hilton, a Colorado resident, is a former Area Manager for

National Accounts at Arthrex who resigned from Arthrex in September 2021 to take a job at Paragon.  (Id. at ¶¶ 1, 3, 9.)  In his role at Arthrex, Mr. Hilton managed approximately eighty-two accounts throughout fourteen states in the central United States.  (Id. at ¶¶ 50, 53.)  He "often handled multi-state and national accounts within the foot and ankle space."  (Id. at ¶ 46.)  This position gave him access to Arthrex's pricing and sales tactics, customer contacts and preferences, and specific discounts and rebates offered to each of Arthrex's clients.  (Id. at ¶ 48.)

On January 16, 2017, Mr. Hilton signed[1] an Employment Agreement with Arthrex, which contained "restrictive covenants, including confidentiality/non-disclosure, non-competition, and non-solicitation of customers and employees."  (Id. at ¶ 38.)  In relevant part, the Employment Agreement created a one-year restricted period following the cessation of Mr. Hilton's employment with Arthrex during which he is prohibited from having any involvement[2] with an Arthrex competitor.

---

[1] Mr. Hilton testified that while he does not deny electronically signing his Employment Agreement, he does not recall doing so.  (Doc. 37 at 34.)  Nevertheless, Mr. Hilton's electronic signature appears on his Employment Agreement.  (See Doc. 1-2 at 12 ("Digitally Signed By: Jeremy Charles Hilton on 01/16/2017").)  Further, Arthrex's Senior Director of Sales for the Western United States, Nathan Speer has testified that in order to digitally sign a document, an employee "ha[s] to log in and put their credentials, passwords, and then digitally sign the document," indicating that Mr. Hilton's signature on the Employment Agreement would require more than a rubber stamp.  (Doc. 37 at 17.)  Finally, Mr. Hilton has confirmed that he digitally signed several other, related employment documents on the same date and through the same digital platform through which he is alleged to have signed his Employment Agreement.  (Id. at 38–39.)  After evaluating Mr. Hilton's testimony and evidence before the Court, the Court finds that notwithstanding Mr. Hilton's lack of recollection of the event, Mr. Hilton signed the Employment Agreement.

[2] The Non-Competition provision of the Employment Agreement states:

Employee agrees that Employee will, during Employee's

(<u>Id.</u> at ¶ 43.)  The Employment Agreement also includes a tolling provision, providing for the extension of the restricted period in the event of the Employment Agreement's violation, and a provision providing for damages and injunctive relief. (<u>Id.</u> at ¶¶ 44–45.)

Mr. Hilton's last day of employment with Arthrex was September 23, 2021. (<u>Id.</u> at ¶ 56.)  On August 30 and September 23, Mr. Hilton inserted a USB/external drive into his company-owned laptop and accessed, and allegedly copied or downloaded, hundreds of documents.  (<u>Id.</u> at ¶¶ 3–4.)  Arthrex claims that the vast majority of the documents accessed were contracts between Arthrex and its customers.  (<u>Id.</u> at ¶ 3.)  A price list, a document with data on Arthrex's largest customers, and a marketing presentation laying out Arthrex's business model are also believed to have been copied.  (<u>Id.</u> at ¶ 5.)  In all, Arthrex contends that Mr. Hilton's alleged downloads contain "Arthrex's sensitive, proprietary, and trade secret information."  (<u>Id.</u>)

On September 27, 2021, Arthrex sent Mr. Hilton a letter, copying Paragon, to remind Mr. Hilton about his restrictive covenants and threatening legal action if he

---

> employment or engagement by [Arthrex] and during the Restricted Period, refrain from, <u>throughout the United States</u>, directly or indirectly, owning, managing, operating, controlling or financing, or participating in the ownership, management, operation, control or financing of, or being connected with or having any interest in, or otherwise taking any part as a stockholder, director, officer, employee, consultant, independent contractor, partner or otherwise in, any business that is competitive with the [Arthrex] as of the date the employment terminates.

(Doc. 1-2 at 7 (emphasis in original).)

failed to honor them.  (Id. at ¶ 57; Doc. 1-2.)  Mr. Hilton responded to the letter saying that the restrictive covenants were not enforceable.  (Doc. 1 at ¶ 58.) Paragon did not respond to the letter.  (Id.)  On October 1, 2021, Mr. Hilton commenced his employment with Paragon.  (Id. at ¶ 56.)

On November 15, 2021, Arthrex filed its Complaint (Doc. 1) alleging: (1) that Mr. Hilton breached his Employment Agreement, (2) that Paragon tortiously interfered with Arthrex's contractual relationship with Mr. Hilton and its existing and prospective customers, clients, and agents, (3) that both Mr. Hilton and Paragon misappropriated Arthrex's trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), and (4) that both Mr. Hilton and Paragon misappropriated Arthrex's trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 ("FUTSA").  (Id. at ¶¶ 85–156.)

## DISCUSSION

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements."  Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008).  Personal jurisdiction is a two-part inquiry wherein the court must determine first, "whether the exercise of jurisdiction is appropriate under [Florida]'s long-arm statute," and second, whether exercising personal jurisdiction over the defendant is consistent with the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.  Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004) (citation omitted).  "Only where

the long-arm statute provides jurisdiction do [courts] proceed to the second step." PVC Windoors, Inc. v. Babbitbay Beach Const., N.V., 598 F.3d 802, 807 (11th Cir. 2010).

Where a defendant challenges personal jurisdiction in a Federal Rule of Civil Procedure 12(b)(2) motion to dismiss, the district court must hear and decide the issue before trial.  Fed. R. Civ. P. 12(i).  In this case, the Court has conducted an evidentiary hearing on both Mr. Hilton's and Paragon's motions to dismiss for lack of personal jurisdiction.  Following an evidentiary hearing, the court "adjudicate[s] the issue of whether the court has jurisdiction over the defendant's person" by "determine[ing] the credibility of the witness testimony, weigh[ing] the evidence, and find[ing] the relevant jurisdictional facts."  PVC Windoors, Inc., 598 F.3d at 810.  "Because the court is making factual determinations and reaching a final decision on jurisdiction, a preponderance-of-the-evidence standard applies." AcryliCon USA, LLC v. Silikal GmbH, 985 F.3d 1350, 1364 (11th Cir. 2021).  The Court will therefore weigh the evidence presented to determine whether Arthrex has met its burden of establishing personal jurisdiction over Mr. Hilton and Paragon by a preponderance of the evidence.

## I.  FLORIDA'S LONG-ARM STATUTE

The application of Florida's long-arm statute is a question of Florida state law and, as a result, courts must construe the long-arm statute as would the Florida Supreme Court.  See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1271 (11th Cir. 2002).  "In the absence of definitive guidance from the Florida

Supreme Court, [courts] follow relevant decisions from Florida's intermediate appellate courts." State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004).

Arthrex argues that the Court has specific personal jurisdiction over both Mr. Hilton and Paragon under the tortious act provision of the Florida long-arm statute, Fla. Stat. § 48.193(1)(a)(2).[3]  (Doc. 34 at 2; Doc. 39 at 9.)  Arthrex also argues that the Court has specific personal jurisdiction over Mr. Hilton under the breach of contract provision of the Florida long-arm statute, Fla. Stat. § 48.193(1)(a)(7). (Doc. 34 at 2.)[4]  Florida's long-arm statute provides in relevant parts:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
> . . . .
> (2) Committing a tortious act within this state.
> . . . .
> (7) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

---

[3] Arthrex has conceded that it did not plead specifically that Paragon's conduct fell under Fla. Stat. § 48.193(1)(a)(2).  (Doc. 35 at 148.)   Nevertheless, where a Complaint alleges facts that would otherwise support the claim, the Court may consider the issue, irrespective of the inclusion or omission of the specific statute at issue in the Plaintiff's briefing.  See Bell Atlantic v. Twombly, 550 U.S. 544, 562–563 (2007) ("Once a claim for relief has been stated, a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.") (quotation omitted).

[4] Although the Complaint raises other grounds for personal jurisdiction, Arthrex is no longer maintaining personal jurisdiction on those grounds (See Doc. 34 at 2 n.2)

Fla. Stat. §§ 48.193(1)(a)(2) & 48.193(1)(a)(7).

## A. Arthrex Has Adequately Alleged that Florida's Long-Arm Statute Applies to Mr. Hilton

Arthrex argues that Mr. Hilton breached his Employment Agreement and misappropriated its trade secrets, thereby enabling this Court to have personal jurisdiction over Mr. Hilton under section 48.193(1)(a)(7) and section 48.193(1)(a)(2), respectively, of Florida's long-arm Statute. (Doc. 34 at 10–16.) Specific personal jurisdiction is claim-specific such that where a complaint presents the Court with separate sets of factual allegations giving rise to separate claims, the Court analyzes the claims separately. See, e.g., Cronin v. Wash. Nat'l. Ins. Co., 980 F.2d 663, 671 (11th Cir. 1993) ("In this case the Florida long-arm statute . . . provides personal jurisdiction over the contract claim but arguably not the negligence claims."). Thus, "a court may hold it has specific personal jurisdiction over a defendant as to one claim but not as to another in the same suit." Argos Glob. Partner Servs., LLC v. Ciuchini, 446 F. Supp. 3d 1073, 1086 (S.D. Fla. 2020). The Court will assess Mr. Hilton's conduct under both sections of the Florida long-arm statute below in order to determine whether either permits the exercise of specific personal jurisdiction over Mr. Hilton.

### i. Florida's Long-Arm Statute's Breach of Contract Provision, Section 48.193(1)(a)(7), Confers Personal Jurisdiction over Mr. Hilton

Section 48.193(1)(a)(7)'s plain and unambiguous language sets forth that courts may exercise jurisdiction over a non-resident defendant when that defendant breaches "a contract in [Florida] by failing to perform acts required by the contract

-8-

to be performed in [Florida]." (emphasis added).  Florida's appellate courts have held that a plaintiff satisfies this section by demonstrating that "such breach formed the basis for the cause of action for which relief is sought by the plaintiff." Cosmopolitan Health Spa, Inc. v. Health Indus., Inc., 362 So. 2d 367, 368 (Fla. 4th DCA 1978).  Arthrex alleges that Mr. Hilton breached his Employment Agreement by violating the non-competition, non-solicitation, and confidentiality provisions contained therein.  (Doc. 1 at ¶¶ 85–104.)  The Court will take up each of these contractual provisions in turn to assess whether Arthrex's allegations bring Mr. Hilton's conduct under Florida's long-arm statute.

**1.  The Alleged Breach of the Non-Competition Provision of the Employment Agreement Does Not Confer Personal Jurisdiction Over Mr. Hilton**

The non-competition provision of Mr. Hilton's Employment Agreement with Arthrex provides that during the restricted period, Mr. Hilton must "refrain from, throughout the United States," direct or indirect involvement with "any business that is competitive with [Arthrex] as of the date the employment terminates." (Doc. 1-1 at 5 (emphasis in original).)  As such, personal jurisdiction is appropriate if Arthrex can show, by a preponderance of evidence, that Mr. Hilton's employment with Paragon was in breach of an act contractually required to be performed in Florida.  Hamilton v. Alexander Proudfoot Co. World Headquarters, 576 So. 2d 1339, 1340 (Fla. 4th DCA 1991) (discussing then section 48.193(1)(g)).

Arthrex alleges that Mr. Hilton has breached the non-competition provision of his employment agreement by "accepting employment with, and continuing to

work for, Paragon" as well as "providing services as an employee to [Paragon] within the restricted area and during the Restricted Period." (Doc. 1 at ¶¶ 92–93.) Arthrex, however, has not alleged that Mr. Hilton is currently working for Paragon, or conducting any of Paragon's business, <u>in Florida</u>. Instead, Arthrex vaguely states that "Mr. Hilton is performing the same duties for Paragon that he performed for Arthrex, in the exact same product space, with many of the same customers." (<u>Id.</u> at ¶ 80.) Matthew Wright, Paragon's Director of National Accounts, averred that Mr. Hilton was hired as a Senior National Accounts Manager to work in the "Western Region" from his home in Colorado. (Doc. 18-1 at ¶¶ 10–11.) This region includes Alaska, Arizona, California, Hawaii, Idaho, Nevada, Oregon, parts of Texas, Utah, and Washington, but <u>not</u> Florida. (<u>See id.</u> at ¶ 17.)

In that sense, Arthrex is effectively asking this Court to find that because the Employment Agreement contained a nationwide non-competition provision, the Employment Agreement was required to be performed in Florida. But because the language of the long-arm statute explicitly requires performance in Florida, and the non-competition portion of the Employment Agreement does not itself require performance in Florida, this argument cannot stand. See <u>KVAR Energy Sav., Inc. v. Tri-State Energy Sols., LLP</u>, No. 608-CV-85-ORL-19KRS, 2009 WL 103645, at *13 (M.D. Fla. Jan. 15, 2009) (finding that "to equate breaching a duty of non-disclosure that has 'no geographical limitations' with the failure 'to perform acts required by the contract to be performed' in Florida" is an argument that is "foreclosed . . . by the statutory language [of the long-arm statute] explicitly

requiring contractual performance <u>in Florida</u>" (emphasis in original)).  As a result, the Court cannot find that the long-arm statute confers personal jurisdiction over Mr. Hilton due to his alleged breach of the non-competition provision of his Employment Agreement.

### 2. The Alleged Breach of the Non-Solicitation Provision of the Employment Agreement Does Not Confer Personal Jurisdiction Over Mr. Hilton

The non-solicitation provision of Arthrex's Employment Agreement with Mr. Hilton requires that during the Restricted Period, Mr. Hilton may not, directly or indirectly, "persuade, encourage, induce or solicit any past, current or prospective customer, business partner, supplier, vendor, physician, health care professional or practice, executive, or business relation of [Arthrex]" to cease or limit its business with Arthrex, expand its business with a competitor, or interfere with relationships between Arthrex and its customers and affiliates.  (Doc. 1-2 at 7.)  After closely reading this contract provision, it is clear that there is no geographic hook within its text and therefore, Arthrex has not sufficiently supported that Mr. Hilton was obligated to perform an act <u>in Florida</u>.  <u>See</u> <u>Olson v. Robbie</u>, 141 So. 3d 636, 640 (Fla. 4th DCA 2014) ("Because the terms of the Agreement do not clearly require performance in Florida, [plaintiff]'s alleged breach was not of an act that was 'required by the contract to be performed in this state.'" (citation omitted)).

As a result, the Court finds that the long-arm statute does not confer personal jurisdiction over Mr. Hilton with respect to his alleged breach of the non-solicitation clause of his Employment Agreement.

-11-

**3. The Alleged Breach of the Confidentiality Provision of the Employment Agreement Confers Personal Jurisdiction over Mr. Hilton**

The Confidential Information section of the Employment Agreement requires Mr. Hilton (1) to "take all steps reasonably necessary to protect [Arthrex's] Confidential Information," (2) to not "use, disclose, copy, disseminate, publish, summarize, or remove from [Arthrex's] premises Confidential Information," and (3) to not use Confidential Information for his personal benefit or "for the benefit of any other person, company, entity or firm." (Doc. 1-1 at 3.) The first and third of these contractual obligations are plainly devoid of specific geographic ties. That is, the language of the Employment Agreement alone does not require Mr. Hilton to protect Arthrex's confidential information or to avoid using such information for the benefit of himself or another in Florida specifically.

The second contractual obligation, however, has a clear geographic hook as it ties Mr. Hilton's required conduct to "[Arthrex's] premises." (Id.) So long as Arthrex can plausibly allege that Mr. Hilton used, copied, or removed confidential information from Arthrex's premises in Florida, Mr. Hilton will fall within the reach of the Florida long-arm statute for having breached a contract requiring performance in Florida. In that sense, the applicability of section 48.193(a)(7) to Mr. Hilton is a matter of the Court's interpretation of the term "premises." If the servers from which Mr. Hilton is alleged to have stolen confidential information are considered part of Arthrex's premises in Florida, this Court will have specific personal jurisdiction over Mr. Hilton under the breach of contract provision of the

Florida long-arm statute.

"When interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent." <u>Heiny v. Heiny</u>, 113 So.3d 897, 900 (Fla. 2d DCA 2013) (internal quotation omitted); <u>see also</u> <u>J.N. Laliotis Eng'g Constr., Inc. v. Mastor</u>, 558 So. 2d 67, 68 (Fla. 2d DCA 1990) ("Words used in an agreement should be given a natural meaning or the meaning most commonly understood in relation to the subject matter and circumstances." (quotation omitted)).  In cases where a term in a contract is indefinite, courts often consult dictionaries for clarification of the term's meaning.  <u>See, e.g.</u>, <u>Famiglio v. Famiglio</u>, 279 So. 3d 736, 741 (Fla. 2d DCA 2019) (Using Merriam-Webster's Collegiate Dictionary to define the word "a" in a contract.)  "Premises" are defined as "a building or part of a building usually <u>with its appurtenances</u>" <u>Premises</u>, <u>Merriam-Webster Dictionary</u> www.merriam-webster.com/dictionary/premise (last accessed Mar. 1, 2022) (emphasis added).  Arthrex's computer servers would therefore seem to be considered a part of Arthrex's premises insofar as they are shown to be appurtenances set up locally within an Arthrex-owned building.

This is not a far-fetched or novel interpretation of the terms at issue.  In fact, several Florida courts have approached analogous questions of personal jurisdiction in a similar manner.  <u>See</u> <u>Hatfield v. AutoNation, Inc.</u> 915 So.2d 1236, 1242-1243 (Fla. 4th DCA 2012) (holding that jurisdiction was warranted where out of state defendant employee had "continuous and systematic general business contact" with employer's Florida office in the form of daily use of employer's Florida-based website

to forward proprietary and confidential information); <u>see also</u> <u>Ware v. Citrix Sys.,</u> <u>Inc.</u>, 258 So. 3d 478, 484 (Fla. 4th DCA 2018) (remanding for the trial court to "consider whether, as a factual matter, the appellants would have been able to access Citrix's Florida servers to obtain confidential business information, which could bring them under the ambit of Florida's long-arm statute").

As Arthrex's Manager of Information Security, Swen Tauber, testified, the servers that Arthrex used to maintain its documents are located in Arthrex's offices in Naples, Florida and in Fort Myers, Florida—both within this Court's geographical jurisdiction.  (Doc. 37 at 29.)  Mr. Tauber added that when an Arthrex computer, such as Mr. Hilton's, is used to access documents via Arthrex's internal document maintenance platforms, the computer pulls documents "[m]ainly from these two server[s]."  (<u>Id.</u>)  And when asked about the "support" that Arthrex employees receive from Arthrex's Naples office, Mr. Speer explained that "critical access to information to sales data, and pricing, access to contracts, access to the share file, access to all the information that we need to go do our job on a daily basis . . . . all of that comes out of Naples."  (Doc. 35 at 35–36.)  Thus, given that Arthrex's servers are important accessory objects, located in the company's Florida office space, Arthrex's premises plausibly include its computer servers.

Arthrex alleges that Mr. Hilton breached the confidentiality provision of the Employment Agreement which required that he not "use, disclose, copy, disseminate, publish, summarize, or remove from [Arthrex's] premises Confidential Information."  (Doc. 1 at ¶ 42.)  Arthrex has presented evidence showing that Mr.

Hilton transferred confidential information from Arthrex's Florida servers to Mr. Hilton's personal iCloud account or thumb drive. (<u>See</u> Doc. 37 at 81 ("[O]n several dates there were mass quantities of files that were – that had timestamps that were just seconds apart that would indicate a transfer, whether it be, you know, to a USB device or to another storage medium")); (<u>see</u> <u>id.</u> at 92 ("[T]here were . . . a large multitude of files that were accessed simultaneously and the only real explanation for that is that they were being copied from one location to another")); (Doc. 2-3 at 8–9 (listing the names of the files accessed by Mr. Hilton from Arthrex's server while a USB or external drive was inserted in his computer).)

Mr. Hilton testified that he did not "download, access, email, or in any way take from Arthrex's servers" any of the confidential information which Arthrex alleged he took in its Complaint, but he has offered no evidence substantiating this testimony. (Doc. 37 at 68–70.) Instead the results of the forensic computer analysis conducted by Robert Rohr, a Senior Analyst with E-Hounds, Inc.,[5] listing the names of the files accessed by Mr. Hilton while a USB or external drive was inserted in his computer, directly controvert Mr. Hilton's testimony.[6] As such, the preponderance

_____

[5] "E-Hounds is a computer evidence company that provides various services including data acquisition, data recovery, and computer forensic services." (Doc. 2-3 at 2.)

[6] When asked by the Court whether he "download[ed], access[ed], email[ed], or in any way [took] from Arthrex's servers" five particular Arthrex files, Mr. Hilton testified that he did not. (Doc. 37 at 68–69.) But the logs prepared by Mr. Rohr show that Hilton at the very least accessed files with those names. (Doc. 2-3 at 8–21.) As Mr. Rohr testified, in order for a file name to appear on this log, "[s]omething within the document would have to be touched, whether it be a file copy or an opening or somebody moving it from one location to another on a

of the evidence appears to indicate that on his last day of employment, Mr. Hilton accessed more than one hundred files and transferred or copied these files from Arthrex's server to his computer.

In sum, Arthrex has shown by a preponderance of evidence that Mr. Hilton breached a contract, namely, the Confidentiality Agreement provision of his Employment Agreement with Arthrex, which required Mr. Hilton to not remove confidential information from Arthrex's premises. Given that Arthrex's premises include its Florida-based servers, Mr. Hilton's contractual obligations with Arthrex required performance in Florida. Therefore, the breach of contract section of the Florida long-arm statute, section 48.193(1)(a)(7), confers personal jurisdiction over Mr. Hilton.

### ii. Florida's Long-Arm Statute's Tortious Act Provision, Section 48.193(1)(a)(2), Confers Personal Jurisdiction over Mr. Hilton

As noted above, section 48.193(1)(a)(2) permits the exercise of personal jurisdiction over a non-resident defendant who commits a tortious act within Florida. Notably, a defendant's "physical presence is not required to 'commit a tortious act' in Florida." See Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002). Rather, "under Florida law, a nonresident defendant commits a tortious act within [Florida] when he commits an act outside the state that causes injury within Florida." See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1353 (11th

---

computer if they were re-foldering something . . . . somebody was either copying or transferring these files somewhere else." (Doc. 37 at 87.) Mr. Rohr further stated "the only real explanation" is that Mr. Hilton downloaded the documents in question. (Doc. 37 at 92.)

Cir. 2013) (emphasis in original) (quotation omitted).

Arthrex asserts that Florida's long-arm statute confers jurisdiction over Mr. Hilton because Mr. Hilton committed a tortious act causing injury in Florida. (Doc. 1 at ¶¶ 121–156; Doc. 34 at 2.) Specifically, Arthrex alleges that Mr. Hilton misappropriated Arthrex's trade secrets in violation of the DTSA and the FUTSA, thereby harming[7] Arthrex at its Florida headquarters. (Doc. 1 at ¶¶ 121–156; Doc. 34 at 3.) Where the basis of jurisdiction is the commission of a tort, the Court must necessarily determine whether the complaint plausibly states a tortious claim in order to determine jurisdiction. See 8100 R.R. Ave. Realty Trust v. R.W. Tansill Constr. Co., 638 So. 2d 149, 151 (Fla. 4th DCA 1994). The Court will assess Mr. Hilton's alleged conduct under the DTSA and the FUTSA below. Because of the substantive similarities between the two statutes, they can be assessed in tandem. See Sentry Data Sys. Inc. v. CVS Health, 361 F. Supp. 3d 1279, 1292–1294 (assessing DTSA and FUTSA together).

The DTSA permits "[a]n owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines "trade secret" broadly, including, in relevant part:

> (3)[A]ll forms of financial, business, scientific, technical, economic, or engineering information . . . if—
> > (A) the owner thereof has taken reasonable

---

[7] Arthrex alleges that the misappropriation of its trade secrets "will cause Arthrex substantial immediate irreparable injury, including the actual and potential loss of client relationships, loss of market share and goodwill, as well as the exposure and loss of its Trade Secrets." (Doc. 1 at ¶¶ 136, 153.)

> measures to keep such information secret; and
> (B) the information derives independent economic
> value, actual or potential, from not being generally
> known to, and not being readily ascertainable
> through proper means by, another person who can
> obtain economic value from the disclosure or use of
> the information[.]

18 U.S.C. § 1839(3)(A)–(B).

Under the DTSA, "misappropriation" includes:

> (B) disclosure or use of a trade secret of another without
> express or implied consent by a person who–
>> (i) used improper means to acquire knowledge of the
>> trade secret;
>> (ii) at the time of disclosure or use, knew or had
>> reason to know that the knowledge of the trade
>> secret was–
>> . . . .
>>> (II) acquired under circumstances giving rise
>>> to a duty to maintain the secrecy of the trade
>>> secret or limit the use of the trade secret . . . .

Id. at §§ 1839(5)(B)(i), 1839(5)(B)(ii)(II).

To bring a claim under the DTSA, a plaintiff must plausibly allege that: (1)

the defendant "possessed information of independent economic value" that (a) "was

lawfully owned by" the plaintiff and (b) for which the plaintiff "took reasonable

measures to keep secret," and (2) the defendant "used and/or disclosed that

information," despite (3) "a duty to maintain its secrecy."  Primo Broodstock, Inc., v.

Am. Mariculture, Inc., No. 2:17-cv-9-FtM-29CM, 2017 WL 1502714, at *11 (M.D.

Fla. Apr. 27, 2017) (internal quotation marks omitted); Am. Red Cross v. Palm

Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998).

The FUTSA similarly provides a private cause of action for the

misappropriation of trade secrets but does so under Florida state law.  Fla. Stat. §§ 688.001–009.  To state a cause of action under the FUTSA, a plaintiff must allege that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it."  <u>Del Monte Fresh Produce Co. v. Dole Food Co., Inc.</u>, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).

The FUTSA defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).  "A party proceeding under [the FUTSA] need only describe the misappropriated trade secrets with 'reasonable particularity.'"  <u>Textile USA, Inc. v. Diageo N. Am., Inc.</u>, No. 15-24309-CIV, 2017 WL 10187642, at *5 (S.D. Fla. July 31, 2017) (citation omitted).

Under the FUTSA, "misappropriation" includes, <u>inter alia</u>:

> (2)(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> 1. Used improper means to acquire knowledge of the trade secret; or
> 2. At the time of the disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
> . . . .
> (b) Acquired under circumstances giving rise to a duty to

maintain its secrecy or limit its use[.]

Fla. Stat. § 688.002(2)(b)(1), § 688.002(2)(b)(2)(b).  "Information that is generally

known or readily accessible to third parties cannot qualify for trade secret

protection."  Am. Red Cross, 143 F.3d at 1410.

Broadly speaking, therefore, under both the DTSA and the FUTSA,

successful claims must establish (1) that the plaintiff possessed trade secrets which

it took reasonable steps to protect, and (2) that those trade secrets were

misappropriated by the defendant.

### 1.  Arthrex Possessed Protected Trade Secrets

Here, Arthrex claims that it possessed confidential information constituting

trade secrets, including (1) contracts with current customers, (2) PowerPoint

presentations containing Arthrex business proposals, (3) documents reflecting "key

information about recent deals closed, pricing/figures for those deals, and the

clients/accounts associated with those deals," (4) documents "focused on Arthrex's

business model, customers, and pricing," (5) Arthrex's entire price list, and (6) a list

of Arthrex's largest customers and details about their preferences, among other

things.  (Doc. 1 at ¶¶ 63–76.)

Arthrex alleges that this confidential information has significant economic

value, that it is not public information, and that Arthrex has taken reasonable steps

to keep this information secret.  (Id. at ¶¶ 28, 142–143.)  These allegations are

supported by the evidence Arthrex has presented.  For example, Mr. Speer testified

that the above-listed confidential information cost Arthrex "millions, probably

hundreds of millions of dollars" to develop and that "[Arthrex is] not a public

company so nobody knows these numbers." (Doc. 35 at 31.)  Mr. Speer's testimony also made clear that Arthrex has taken "tremendous precautions" to protect the confidentiality of its documents, including requiring employees to use "multifactor sign-ons" and to undergo "extensive training, regular training throughout the year, about document control, about sensitivity to the information that we have access to and we're responsible for."  (Id. at 32.)  Mr. Hilton has not argued that this confidential information does not constitute a trade secret.

Accordingly, because Arthrex has shown that it derives independent economic value from this information being kept confidential, and because it has demonstrated the safety measures in place to keep this information confidential, the Court finds that Arthrex has established, at least at this stage of the litigation, that the confidential information in question meets the definition of a trade secret.[8]

### 2.  Arthrex's Trade Secrets Were Misappropriated

Having established that Arthrex was in possession of trade secrets, the second component of the DTSA and the FUTSA analyses requires the Court to determine whether Arthrex has plausibly alleged that Mr. Hilton misappropriated its trade secrets.  As both the DTSA and the FUTSA make clear, a person who has a duty to maintain the secrecy of a trade secret or limit the use of another's trade

---

[8] Florida law is in accord with this outcome.  For example, under Florida law customer lists "are generally considered trade secrets provided: (1) the list was acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public; and (2) the owner shows that it has taken reasonable efforts to maintain the secrecy of the information."  Digital Assurance Certification, LLC v. Pendolino, No. 6:17-CV-72-ORL-31TBS, 2017 WL 320830, at *2 (M.D. Fla. Jan. 23, 2017).

secret, and discloses or uses another's trade secrets, has misappropriated that trade secret.  18 U.S.C. § 1839(5)(B)(i)–(ii); Fla. Stat. § 688.002(1)–(2).

The Eleventh Circuit has instructed that "the bar for what counts as 'use' of a trade secret is generally low." Compulife Software Inc. v. Newman, 959 F.3d 1288, 1313 (2020).  "[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1292 (11th Cir. 2003) (citation omitted). Notably, "[a]lthough the trade secret owner bears the burden of proving unauthorized use, proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant."  Restatement (Third) of Unfair Competition § 40 (1995).

Arthrex claims that Mr. Hilton has misappropriated its trade secrets because he "has disclosed or intends to disclose Arthrex's Trade Secrets to Paragon, his new employer" and "is using or intends to use the Trade Secrets to benefit Paragon's business, without Arthrex's express or implied consent."  (Doc. 1 at ¶ 148.)  Arthrex has alleged, and provided evidence supporting, that on August 30, 2021, and September 23, 2021, Mr. Hilton inserted a USB or external drive into his company-owned laptop and accessed hundreds of documents, the majority of which constitute Arthrex's trade secrets.  (Id. at ¶¶ 3–4; Doc. 2-3 at ¶ 11.)  While Mr. Speer—Mr. Hilton's supervisor at Arthrex—testified that Mr. Hilton would regularly "download those Arthrex files from its server and put them on his laptop," in the course of his

employment at Arthrex, this does not explain why, on his last day of his employment, Mr. Hilton accessed 112 PDFs over the course of a 40-minute period and moved them to a USB/external drive.  (Doc. 35 at 47; Doc. 2-3 at ¶¶ 11–12.) Nor does it explain why Mr. Hilton was accessing contracts between Arthrex and its customers in geographical areas outside Mr. Hilton's assigned region.  (See Doc. 35 at 48 ("What [Mr. Hilton] would have been responsible for is just within his region"); Doc. 35 at 49 ("I know that [Mr. Hilton] accessed, on 8/30, specific contracts in the Pacific region that he had nothing to do with."))  These circumstances suggest that Mr. Hilton used Arthrex's confidential information without Arthrex's consent.

Further, Arthrex has alleged that Mr. Hilton knew he had a duty to maintain the secrecy of this confidential information.  (See Doc. 1-1 at 3 ("[B]oth during and after Employee's employment with the Company, Employee agrees to hold in strict confidence all Confidential Information and to take all steps reasonably necessary to protect the Company's Confidential Information"); see also Doc. 35 at 32 ("We go through extensive training, regular training throughout the year, about document control, about sensitivity to the information that we have access to and we're responsible for.").)

Through showing by a preponderance of the evidence that Mr. Hilton used Arthrex's confidential information without Arthrex's consent, even though he had a duty to maintain the secrecy of that information, Arthrex has plausibly stated the elements of a claim that Mr. Hilton misappropriated Arthrex's trade secrets under

both the DTSA and FUTSA. Accordingly, the Florida long-arm statute's tortious conduct provision applies to Mr. Hilton because a preponderance of the evidence indicates that Mr. Hilton has committed a tortious act causing injury within Florida. In sum, this Court has personal jurisdiction over Mr. Hilton under both section 48.193(1)(a)(7) and section 48.193(1)(a)(2) of the Florida long-arm statute.

## B. Florida's Long-Arm Statute Does Not Confer Personal Jurisdiction Over Paragon

Arthrex also asserts that Paragon is subject to this Court's jurisdiction under the tortious conduct provision of Florida's long-arm statute. Specifically, Arthrex alleges that Paragon (1) misappropriated Arthrex's trade secrets under the DTSA and FUTSA, and (2) tortiously interfered with Arthrex's contract with Mr. Hilton and its other business relations, all of which caused injury to Arthrex in Florida. (Doc. 1 at ¶¶ 105–156; Doc. 39 at 9.) The Court will assess these claims sequentially to determine whether either is sufficiently supported against Paragon to trigger Florida's long-arm statute.

### i.  Arthrex has not Shown by a Preponderance of Evidence that Paragon Misappropriated Arthrex's Trade Secrets

As established above, Arthrex satisfies the first two elements required to state a cause of action under the DTSA and FUTSA. That is, Arthrex possessed trade secrets[9] and took reasonable steps to protect their secrecy. The third element

---

[9] Paragon has expressed doubt that the documents identified by Arthrex on Mr. Rohr's investigative logs are, in fact, trade secrets since they were submitted under seal and have not been reviewed by counsel for Paragon. (See Doc. 37 at 118 ("[Paragon is] now left to having Mr. Speer testify about a document that [it] know[s] nothing about nor [has it] ever seen.")). At this stage of the litigation,

of a misappropriation claim under the DTSA and the FUTSA asks whether the
trade secrets in question were misappropriated by Paragon.  For the reasons
outlined below, Arthrex has failed to establish that Paragon misappropriated its
trade secrets in violation of the DTSA or the FUTSA.

Arthrex alleges that "Paragon has received or possesses Arthrex's Trade
Secrets, or improperly accessed or threatens to improperly access, copy, use, and
otherwise misappropriate Arthrex's Trade Secrets" and that Paragon "knew or had
reason to know that the Trade Secrets were acquired . . . through a person who
owed a duty to maintain their secrecy."  (Doc. 1 at ¶¶ 131–132.)

Under the DTSA, misappropriation of a trade secret includes, <u>inter alia</u>,
using another's trade secret, without consent, by a person who, at the time of use,
knew or had reason to know that the trade secret was:

> (I)    derived from or through a person who had used improper means
>        to acquire the trade secret;
> (II)   acquired under circumstances giving rise to a duty to maintain
>        the secrecy of the trade secret or limit the use of the trade
>        secret; or
> (III)  derived from or through a person who owed a duty to the person
>        seeking relief to maintain the secrecy of the trade secret or limit
>        the use of the trade secret . . . .

18 U.S.C. § 1839(5)(B)(ii)(I)–(III).

And under the FUTSA, misappropriation of a trade secret includes, in

---

however, Arthrex's investigative logs and accompanying testimony (Doc. 2-3)
constitute sufficient evidence to support its contention that those files are trade
secrets.  While the file names are redacted in part, they do contain identifying terms
indicating that they contain confidential information such as "purchase agreement,"
"products and pricing," "financials," and "eval data."  (Doc. 2-3 at 8–15).

relevant part, "[d]isclosure or use of a trade secret of another without express or implied consent by a person who: . . . (2) At the time of the disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was: . . . (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." Fla. Stat. § 688.002(2)(b)(1)–(2).

Arthrex has failed, however, to establish that Paragon either received or used any of its trade secrets. While Arthrex has provided evidence that Mr. Hilton <u>may</u> have misappropriated its trade secrets by moving various documents from Arthrex's server to a USB or external drive, it has simply provided no evidence whatsoever that Paragon has solicited those documents from Mr. Hilton, that Paragon possesses those documents or will possess those documents, or that Mr. Hilton will use those documents in the course of his employment with Paragon. Instead, Arthrex relies on pure, unfounded speculation about Paragon's intentions. (<u>See, e.g.</u>, Doc. 1, ¶¶ 148–149.)

At the same time, Paragon has introduced significant evidence rebutting Arthrex's claims that it used or is using Arthrex's trade secrets. For example, Mr. Wright testified that Paragon is not allowing Mr. Hilton to work in any of the areas or territories that he worked in while he was at Arthrex. (Doc. 35 at 96, 97.) Further, in his affidavit, Mr. Wright averred that "Mr. Hilton has not provided to Paragon any confidential or trade secret information belonging to Arthrex" and "Paragon has not seen, accessed, or used any of Arthrex's confidential and/or trade secret information belonging to Arthrex." (Doc. 31-1 at ¶ 19.) Without providing

any further evidence, Arthrex has failed to establish that Paragon misappropriated its trade secrets.  Accordingly, the Florida long-arm statute's tortious conduct provision does not apply to Paragon with respect to Arthrex's trade secret misappropriation claims under the DTSA and FUTSA.

### ii.   Paragon Did Not Tortiously Interfere with Arthrex's Contractual or Business Relations

Arthrex further claims that Paragon committed tortious acts causing harm in Florida by (1) intentionally hiring Mr. Hilton and continuing to employ him despite Paragon's knowledge of Arthrex's contractual relationship with Mr. Hilton, and (2) "using Arthrex's Confidential Information and Trade Secrets to market or otherwise seek business from Arthrex's existing and prospective customers, clients or agents." (Doc. 1 at ¶¶ 109, 113.)  In Florida, tortious interference with business relations is a separate and discrete cause of action from tortious interference with contractual relations.  See Franklin v. Brown, 159 So. 2d 893, 895 (Fla. 1st DCA 1964).  While some of the elements of the two are similar, in order to avoid blurring the significance of the liability factors involved in each, the business relations and contractual relations claims will be analyzed separately.

### 1.   Tortious Interference with Business Relations

Under Florida law, a claim for tortious interference with business relations requires "(1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship."  Ethan Allen, Inc. v. Georgetown

<u>Manor, Inc.</u>, 647 So. 2d 812, 814 (Fla. 1994) (quotation omitted).

Arthrex alleges that Paragon has interfered with its business relations with its "existing and prospective customers, clients, and agents." (Doc. 1 at ¶ 111.) Specifically, Arthrex states that "Paragon is aware of those relationships (directly or indirectly through its employee, Mr. Hilton), and that Paragon is tortiously interfering with those relationships by improperly employing Mr. Hilton and using (directly or indirectly through Mr. Hilton) Arthrex's confidential, proprietary and trade secret information, causing injury to Arthrex." (Doc. 39 at 16.)

Arthrex has presented evidence that Mr. Hilton managed just over 100 contracts with Arthrex customers and provided services for approximately 82 accounts. (Doc. 1 at ¶ 50; Doc. 35 at 22–23.) Mr. Hilton had access to the contact information of the individuals responsible for making purchasing decisions as well as specific purchasing information and preferences for each of Arthrex's customers. (Doc. 35 at 25.) Arthrex has also alleged that Mr. Hilton had regular contact with a number of national accounts, including Catholic Health Initiatives, United Surgical Partners International, Surgical Care Affiliates, and Vizient. (Doc. 1 at ¶ 51.) Paragon knew of these relationships and discussed them with Mr. Hilton during the interviewing and hiring process. (Doc. 35 at 95–96.) Thus, the first and second elements of the tortious interference with business relations claim have been satisfied.

Nevertheless, Arthrex has presented no evidence that Paragon has used Mr. Hilton to interfere intentionally and unjustifiably with any of its business relations.

There is simply no indication at this juncture that Mr. Hilton has given <u>any</u> of

Arthrex's confidential information to Paragon.  (<u>See, e.g.</u>, <u>id.</u> at 45 ("Q. And you

don't know if Paragon was given any information from Arthrex; true? A. True."))

Instead, Paragon has presented evidence that it took substantial steps to avoid

interfering with Arthrex's business relationships.  (Doc. 31-1 at 4; Doc. 35 at 95–97.)

For example, Mr. Wright testified that: (1) Mr. Hilton does not negotiate any

contracts with Paragon's Florida customers; (2) Mr. Hilton's sales region does not

include any of the geographies in which he worked previously; (3) Mr. Hilton is not

permitted to negotiate contracts, or participate in negotiating contracts, with any of

his former clients from Arthrex; and (4) Mr. Hilton does not have any contact with

the four national accounts referenced by Arthrex in its Complaint.  (Doc. 18-1 at ¶¶

17–19; Doc. 31-1 at ¶¶ 16–17; Doc. 35 at 95–101.)

Further, Arthrex has not introduced any evidence that any of its business

relations with its customers have actually been interfered with.  In fact, Paragon

has presented testimonial evidence that it already had business relations of its own

with several of Arthrex's customers prior to hiring Mr. Hilton.  (<u>See, e.g.</u>, Doc. 35 at

98–99 (explaining that Paragon already had a contract with Common Spirit and

United Surgical Partners International).)  Paragon has also presented testimonial

evidence that it is uninterested in pursuing business relations with some of

Arthrex's customers.  (<u>See, e.g.</u>, id. at 100–101 (explaining that Paragon will not be

pursuing a contract with Vizient because, "It costs a lot of money to contract with

them, so we just don't have any . . . we don't see the value in it.")).  In sum, Arthrex

has failed to plausibly establish that Paragon is tortiously interfering with its business relations by merely employing Mr. Hilton.  Accordingly, the Court finds that the tortious act provision of the Florida long-arm statute does not confer personal jurisdiction over Paragon with respect to this allegation.

### 2.  Tortious Interference with Contractual Relations

"The elements of a Florida law tortious interference with contractual relations claim are: (i) the existence of a contract; (ii) the defendant's knowledge thereof; (iii) the defendant's intentional and unjustified procurement of a breach thereof; and (iv) damages." Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC, 904 F.3d 1197, 1215 (11th Cir. 2018).  "Imbedded within these elements is the requirement that the plaintiff establish that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." Chi. Title Ins. v. Alday-Donalson Title Co. of Fla., 832 So. 2d 810, 814 (Fla. 2d DCA 2002).

Here, Arthrex has easily demonstrated the first two elements of its tortious interference with contractual relations claim.  First, Arthrex has shown the existence of an Employment Agreement between Arthrex and Mr. Hilton, which included non-competition, non-solicitation, and confidential information obligations. (See Doc. 1-1.)  Second, Arthrex has demonstrated that prior to hiring Mr. Hilton, Paragon was aware of this Employment Agreement between Mr. Hilton and Arthrex.  (See Doc. 37 at 59–60.)  Moreover, the record reflects that upon learning of Mr. Hilton's non-compete agreement with Arthrex, Paragon obtained a copy of the agreement from Mr. Hilton.  (Id. at 60). ("Q. 'So fair to say you did, in fact, prior to

hiring Mr. Hilton, see Mr. Hilton's non-compete agreement?'  A. 'We did review what we deemed as relevant non-compete information; correct.'").

The third element of the tortious interference claim provides that a third party intentionally interferes with a contract by "influencing, inducing, or coercing one of the parties [to the contract] to . . . . breach the contract."  <u>Farah v. Canada</u>, 740 So. 2d 560, 561 (Fla. 5th DCA 1999).  Arthrex has shown by a preponderance of the evidence that Paragon influenced Mr. Hilton to breach the non-competition portion of his Employment Agreement by telling him that this portion was unenforceable.  Mr. Wright, reached out to Mr. Hilton via LinkedIn in July 2021, letting him know of an open position at Paragon, and then in August 2021 had a phone call with Mr. Hilton in which they discussed, among other things, Mr. Hilton's non-compete with Arthrex.[10]  (Doc. 35 at 93–95.)  Mr. Wright testified that Paragon "reviewed an employment agreement between Arthrex and Hilton," noted that Mr. Hilton "had a restrictive covenant that did not allow him to go to work for a competitor," and, notwithstanding that agreement, "made the decision to hire [Mr. Hilton]."  (Doc. 37 at 61.)  Mr. Wright further attested that Paragon's legal team advised him that Paragon could hire Mr. Hilton despite the non-compete it had knowledge of because it believed that clause to be unenforceable.  (Doc. 35 at 111 ("Q. 'Paragon was aware of the non-compete, it knew that the non-compete was

---

[10] Notably, during the interviewing and hiring process, Mr. Wright also addressed any confidential and trade secret information that Mr. Hilton obtained while working at Arthrex, and Mr. Wright told Mr. Hilton, "We do not want it, we don't need it, we don't use it."  (Doc. 35 at 95.)

national scope, but you guys decided to hire him anyway because you thought you could kind of beat the scope of the not compete; fair?' A. '. . . I was advised that we could hire him.'".).)

Thus, by presenting evidence that Paragon recruited Mr. Hilton, reviewed the non-compete provision of his Employment Agreement, and persisted in the hiring process despite its knowledge that Mr. Hilton's employment with Paragon would be in violation of his nationwide non-compete agreement, Arthrex has sufficiently shown that Paragon helped to procure Mr. Hilton's breach of his Employment Agreement with Arthrex.

The final element of a tortious interference with contractual relations claim asks what damages the plaintiff suffered as a result of the defendant's interference. See Advantor Sys. Corp. v. DRS Tech. Servs., Inc., 678 F. App'x 839, 850–53 (11th Cir. 2017). Damages need not be quantified with exactitude, but they "may not be determined by mere speculation or guess." Lehrman v. Gulf Oil Corp., 500 F.2d 659, 668 (5th Cir. 1974) (quotation omitted). The Florida Supreme Court has found that lost profits from potential future sales to past customers is not a basis for a claim of tortious interference under Florida law. Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1542–44 (11th Cir. 1993), certified question answered, 647 So. 2d 812 (Fla. 1994). Instead, the damages alleged must arise from an actual negative effect upon the contract which was interfered with by the defendant. Chipley v. Atkinson, 23 Fla. 206, 208 (Fla. 1887) ("The speculative profits of a proposed business cannot be the basis of the assessment of actual

damages.")  Such damages are not inferred automatically from the breach of

contract.  See Tietig v. Southeast Regional Const. Corp., 557 So. 2d 98, 99 (Fla. 3d

DCA 1990) (holding that a claim for tortious interference with a contract requires a

showing that the interference was the proximate cause of the damage claimed); see

also Astro Tel, Inc. v. Verizon Fla., LLC, 979 F. Supp. 2d 1284, 1297 (M.D. Fla.

2013) (explaining that conduct which has only incidental consequences on the

plaintiff will not support a claim of tortious interference).

 Finally, as several Florida courts have held, failure to prove actual damages

is fatal to a tortious interference claim.  See, e.g., Alphamed Pharm. Corp. v. Arriva

Pharm., Inc., 432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006), aff'd, 294 Fed. Appx. 501

(11th Cir. 2008) ("Because AlphaMed was unable to prove its entitlement to lost

profit damages, the only measure of damages sought, AlphaMed's claim for

tortious interference fails as a matter of law.")

 Here, Arthrex has not identified any damage that it has actually suffered as

a result of Paragon's hiring of Mr. Hilton.  (Doc. 35 at 60.)  Rather, the damages

that Arthrex alleges are purely speculative.  For example, Arthrex has proffered

testimony from Mr. Speer, attesting to the fact that "the threat of those damages is

very significant," but offering no evidence that any damages have actually been

incurred or that they are reasonably likely to be incurred in the future.  (Id. at 40.)

Arthrex has therefore not provided evidence that Paragon's hiring of Mr. Hilton

caused any damages in the form of lost profits, lost investments, damage to its

customer relations, or damage to its business reputation and goodwill, despite the

allegations in its Complaint.  (Doc. 1 at ¶ 115.)  Accordingly, the Court finds that Arthrex has not sufficiently established that Paragon tortiously interfered with Arthrex's Employment Agreement with Mr. Hilton, and, as a result, the Florida long-arm statute does not apply to Paragon.

Because the Florida long-arm statute does not confer personal jurisdiction over Paragon on any of the counts brought against Paragon by Arthrex, this Court does not have personal jurisdiction over Paragon.  Thus, with Florida's long-arm applying only to Mr. Hilton, the Court need only perform the second part of the personal jurisdiction analysis, which considers whether the exercise of personal jurisdiction complies with due process, for Mr. Hilton.

## II.    <u>DUE PROCESS</u>

The second part of the personal jurisdiction analysis requires the Court to consider whether the exercise of personal jurisdiction over Mr. Hilton would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. <u>Mut. Serv. Ins. Co.</u>, 358 F.3d at 1319.  Due process "requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'"  <u>Id.</u> (quoting <u>Sculptchair, Inc. v. Century Arts, Ltd.</u>, 94 F.3d 623, 626 (1996)).

As the Eleventh Circuit has explained, where a "nonresident defendant contractually agreed to personal jurisdiction in Florida, the usual due process analysis need not be done."  <u>Alexander Proudfoot Co. World Headquarters L.P. v.</u>

Thayer, 877 F. 2d 912, 921 (11th Cir. 1989).  Indeed, if parties to a contract "agree in advance to submit to the jurisdiction of a given court," such agreement is "taken to represent express or implied consent to the personal jurisdiction of the court." Ins. Corp. of Ir., Ltd. v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 703–704 (1982).  So long as the forum selection provision of the contract is freely negotiated and not unreasonable or unjust, its enforcement "does not offend due process." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–473 & 472 n.14 (1985).

Here, section 10 of Mr. Hilton's Employment Agreement with Arthrex provides that "Employee agrees to submit to the jurisdiction of the State of Florida." (Doc. 1-1 at 8.)  As noted, Arthrex has shown that Mr. Hilton signed the Employment Agreement in 2017.  (Doc. 1-1 at 10; Doc. 37 at 16.)  Mr. Hilton has not presented any evidence that the Employment Agreement was signed under duress or that it is unjust.  Further, Mr. Hilton does not deny signing the Employment Agreement, and he has acknowledged the existence of the forum selection provision contained in his Employment Agreement.  (Doc. 37 at 34–35.)  Because Mr. Hilton contractually agreed to the forum selection outlined in his Employment Agreement, he has consented to jurisdiction in the state of Florida.  Accordingly, the exercise of personal jurisdiction over Mr. Hilton in this Court is proper and does not violate due process.

## III.  PRELIMINARY INJUNCTION

Arthrex also moves for a preliminary injunction against Mr. Hilton and Paragon, requesting that Mr. Hilton be enjoined from continuing his employment

with Paragon. (Doc. 2.) The gravamen of Arthrex's complaint is that Mr. Hilton's employment with Paragon, a direct competitor of Arthrex, will irreparably damage Arthrex's business. (Doc. 2 at 24.) Specifically, Arthrex argues that "Hilton will use Arthrex's Confidential Information and Trade Secrets to directly compete with Arthrex, undercut/outbid Arthrex for contracts, and divert business away from Arthrex and to Paragon." (Id. at 24.) These are serious allegations, and the Court does not take them lightly. Nevertheless, for the reasons outlined below, the Court finds that Arthrex is not entitled to the preliminary injunction which it seeks.

## A. Legal Standard

Preliminary injunctions may be entered where the movant establishes four elements: (1) a substantial threat of irreparable injury; (2) a substantial likelihood of success on the merits; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest. Friedenberg v. Sch. Bd. of Palm Beach Cnty., 911 F.3d 1084, 1090 (11th Cir. 2018) (quotation omitted). A preliminary injunction is an "extraordinary and drastic remedy" that should not be granted unless the movant carries the burden of persuasion as to all four elements. Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted). Failure to show any of the four factors is fatal. ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009); see also Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) (declining to address the other, remaining prerequisites of preliminary injunctive relief where

the plaintiff had failed to establish the first prerequisite).

### B. Arthrex Has Not Demonstrated a Substantial Threat of Irreparable Injury

A showing of irreparable injury is "the sine qua non of injunctive relief." Ne. Fla. Chapter of the Ass'n of Gen. Contractors, 896 F.2d at 1285. The Eleventh Circuit has cautioned that "even if [a plaintiff] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). "A party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." Church, 30 F.3d at 1337.

Irreparable injury is an injury for which there is no adequate remedy at law. Sampson v. Murray, 415 U.S. 61, 88 (1974). It is "of such nature that it cannot be redressed in a court of law; an injury for which monetary compensation will not suffice." Gonzalez v. Benoit, 424 So.2d 957, 959 (Fla. 3d DCA 1983). "'Irreparable injury will never be found where the injury complained of is doubtful, eventual or contingent.'" State, Dep't of Health v. Bayfront HMA Medical Center, LLC, 236 So.3d 466, 475 (2018). Further, "money damages and loss of business to a competitor generally will not suffice to demonstrate irreparable injury." Id.; see also Stand Up for Animals, Inc. v. Monroe County, 69 So.3d 1011 (Fla. 3d DCA 2011).

Arthrex claims that it will suffer irreparable harm absent a preliminary injunction. (Doc. 2 at 16–18.) Specifically, Arthrex states that "by accepting

Paragon's employment offer, Mr. Hilton is unabashedly violating [the] reasonable and necessary restrictions" contained in his Employment Agreement, and this violation will lead to an "unfair competitive advantage" for Paragon and "lost business opportunities" for Arthrex.  (Id. at 17–18.)  According to Arthrex, Paragon will be able to "market, through Mr. Hilton, to the same pool of clients that Arthrex serves, armed with Arthrex's Confidential Information and Trade Secrets," which will cause Arthrex "destruction of customer relationships, reputation, and goodwill." (Id. at 18.)

But based on the facts alleged, Arthrex's concerns appear unfounded. Arthrex argues that its forensic investigation, which revealed that Mr. Hilton accessed confidential information and trade secrets in the final hours of his employment with Arthrex, establishes Mr. Hilton's likelihood to use such information in his employment with Paragon and, ipso facto, to cause injury to Arthrex.  (Id. at 20–22.)  Neither in its pleading nor at the evidentiary hearings, however, has Arthrex stated or proven that Paragon has actually obtained any of Arthrex's confidential information or trade secrets.  Further, Arthrex has not provided any evidence that Paragon has used, is using, or will use, any such information in a manner that will cause irreparable injury to Arthrex.

Meanwhile, Paragon has established that it took substantial steps to mitigate whatever specter of harm was raised by Mr. Hilton's accessing Arthrex's confidential information in the final hours of his employment.  As outlined above, to ensure that Mr. Hilton would have no overlap with Arthrex, Paragon carved out

substantial portions of the sales region for which Mr. Hilton is responsible, prevented Mr. Hilton from conducting any business with Florida clients, and told Mr. Hilton explicitly during the hiring process that it did not want, nor would accept, confidential information or trade secrets that Mr. Hilton might have acquired.  (Doc. 18-1 at ¶¶ 10–11, 17; Doc. 35 at 95–97).  These efforts to limit Mr. Hilton's potential interference with Arthrex's competitive advantage and business opportunities certainly minimize the threat of irreparable injury which Arthrex alleges, rendering it all the more speculative and remote.

In sum, Arthrex has failed to allege that it is suffering, or will suffer, any serious harm as a result of Mr. Hilton's employment with Paragon.  Given that Arthrex has made no showing that "a real and immediate–as opposed to a merely conjectural or hypothetical–threat of future injury," Church, 30 F.3d at 1337, it has failed to allege a substantial threat of irreparable injury without entry of an injunction.  "[W]here a plaintiff fails to establish irreparable harm, the court need not address each element of a claim for preliminary injunctive relief."  Osborne Associates, Inc., v. Cangemi, 2017 WL 5443145, *7 n. 16 (M.D. Fla. 2017). Accordingly, Arthrex's Motion for Preliminary Injunction is due to be denied.

## **CONCLUSION**

Arthrex has shown by a preponderance of evidence that this Court has personal jurisdiction over Mr. Hilton, but it has not shown that this Court has personal jurisdiction over Paragon.  Further, Arthrex has failed to establish the four elements required for the Court to issue a preliminary injunction against Mr. Hilton

and Paragon, and, as a result, Arthrex's Motion for Preliminary Injunction cannot be granted.

Accordingly, it is **ORDERED**:

    (1) Defendant Jeremy Hilton's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction (Doc. 30) is **DENIED**.

    (2) Defendant Paragon 28, Inc.'s Motion to Dismiss the Complaint (Doc. 31) is **GRANTED**.

    (3) The claims against Paragon 28, Inc. are **DISMISSED** without prejudice. The Clerk is **DIRECTED** to terminate Paragon 28 from the case.

    (4) Arthrex's Request for Preliminary Injunction (Doc. 2) is **DENIED.**

**ORDERED** at Fort Myers, Florida, on March 8, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE